IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DAWN NYHOLM,

           Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

           Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-187 (JBS)

**OPINION**

APPEARANCES:

Richard Lowell Frankel, Esq.
BROSS & FRANKEL, PA
102 Browning Lane, Bldg C-1
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Roxanne Andrews, Esq.
Social Security Administration
Office of the Regional Chief Counsel
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
    Attorney for Defendant

**SIMANDLE, Chief Judge:**

**I. INTRODUCTION**

In this action, Plaintiff Dawn Nyholm (hereinafter, "Plaintiff" or "Ms. Nyholm") seeks review of the Commissioner of the Social Security Administration's (hereinafter, "Defendant" or "the Commissioner") denial of her application for Supplemental Security Benefits under Title XVI of the Social Security Act ("SSA"), pursuant to 42 U.S.C. § 405(g).

Plaintiff claims that she is disabled due to a host of impairments, including lumbar and cervical radiculopathy, degenerative disc disease, bulging discs, cervical facet arthropathy, myofascial pain syndrome, left ankle tendonitis, bilateral knee pain, urinary retention, post concussive syndrome, endometriosis, psoriasis affecting feet and hands, and anxiety and depression.  On January 22, 2015, Administrative Law Judge ("ALJ") Marguerite Toland issued a 27-page opinion finding that Plaintiff was not entitled to Social Security benefits. The ALJ arrived at the decision after taking testimony from Plaintiff as well as receiving written interrogatories from Vocational Expert ("VE") Louis P. Szollosy.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on four grounds. First, she argues that ALJ Toland's finding as to her residual functional capacity ("RFC") was not supported by substantial evidence because the ALJ did not give appropriate weight to the opinions of Plaintiff's treating physicians.  Second, Plaintiff argues that ALJ Toland erred in her evaluation of the interrogatories propounded by the Plaintiff on the VE.  Third, she argues that the ALJ erred in her Step Two analysis by not including Plaintiff's non-severe impairments in the formulation of RFC.  And finally, Plaintiff argues that ALJ Toland erred in her determination of credibility.

For the reasons that follow, and after careful review of the entire record, the parties' submissions, and the applicable law, the Court will remand the case for further adjudication regarding the inclusion of Plaintiff's non-severe impairments in the formulation of RFC.

## II.  BACKGROUND

### A. Procedural Background

Plaintiff filed an application for social security disability benefits on September 25, 2012, alleging an onset of disability from June 1, 2011, at the age of 31. Her claim was initially denied on January 15, 2013, and upon reconsideration on July 8, 2013. (R. at 19.)  A hearing before ALJ Marguerite Toland was held on March 6, 2014, which resulted in an unfavorable decision, dated January 22, 2015, finding Plaintiff not disabled. (Id. at 53.)  The VE was unable to attend the hearing, but instead completed written interrogatories from the ALJ, including additional interrogatories posited by the Plaintiff (Id. at 56, 234-53.)  Plaintiff then requested review of the hearing decision the Appeals Council, but the Council denied Plaintiff's Request for Review on November 10, 2015. (Id. at 1, 14-15.)  This appeal followed.

### B. Factual Background

Plaintiff was born on August 18, 1979 and is currently 37 years old. (Id. at 88.)  She is a high school graduate with two

3

years of college, and has past relevant work as a collection agent. (Id. at 191.)

### 1. Initial Back Pain

Plaintiff began experiencing lower back pain as far back as April 2003, when she was involved in a motor vehicle accident. (Id. at 318.)  She saw Edward T. Soriano, D.O. and Trina Lasko, D.O. on numerous occasions between 2005-2010 to help treat her pain. (Id. at 305-310, 313, 316.)  In a November 2010 visit to Dr. Philip Tasca, Plaintiff noted "continued back pain, which is unchanged and chronic." (Id. at 266.)  On April 7, 2011, Plaintiff saw Jennifer Windstein, M.S., P.A.-C., and complained of back pain radiating into the left glute (5-6/10 on the VAS pain scale), and at times shooting pain into the bilateral feet. (Id. at 262.)  Plaintiff was assessed with lumbosacral spondylosis, chronic and stable; history of cervical spine spondylosis, and eczema, and opted to proceed with injection therapy. (Id. at 263.)  On June 9, 2011, Plaintiff informed Ms. Windstein that she could not pay for an injection, so Ms. Windstein changed Plaintiff's medications to Percocet, MSContin, Valium and Neurotonin.  On August 11, 2011, Plaintiff returned to Ms. Windstein, complaining about muscle spasm and shooting pain to the lower extremity. (Id. at 260.) She was observed walking to the examination room, from the examination room, and to her car. (Id.)

Barry Gleimer, D.O. examined Plaintiff on January 4, 2012, and found that Plaintiff exhibited palpatory tenderness over the lumbar musculature left more than right, with facet tenderness at the L4-5 and L5-S1 levels (Id. at 521.)  Dr. Gleimer diagnosed Plaintiff with lumbar disc protrusion at L5-SI with a disc buldge at L4-5, facet arthrosis at L4-5 and L5-SI and chronic lower back pain. On February 5, 2012, after seeing Dr. Mohsen Kalliny, Plaintiff was diagnosed with lumbar disc herniation and lumbar radiculopathy. (Id. at 404.)  Plaintiff followed up with Dr. Kalliny on March 6, 2012, and indicated an increase in her pain (8 out of 10) and pain during the procedure (Id. at 402, 421.) After an MRI on March 22, 2012 revealed multilevel lumbar disc bulging/protrusion; multilevel bulging cervical disc; acute lumbar radiculopathy, and cervical facet arthrosis with degenerative disc disease, Plaintiff was given stronger medication, including 120 Percocet from Dr. Kalliny each month. (Id. at 31.)[1]

Then, on August 10, 2012, Plaintiff indicated to Dr. Louis Spagnoletti that she had neck pain radiating into the upper extremities, low back pain radiating into the lower extremities, and headaches. (Id. at 430.) Dr. Spagnoletti diagnosed Plaintiff with lumbar and cervical radiculopathy, ambulatory dysfunction,

---

[1] An MRI of the lumbar spine performed on March 22, 2012 revealed bulging discs at T11-12. (Id. at 395-422.)

cervical facet atrophy, cervical and lumbar degenerative disc disease, migraine and myofascial pain syndrome (Id. at 431.) Plaintiff continued to see Dr. Spagnoletti throughout the fall of 2012 and into early 2013. (Id. at 527-29, 531-533, 690-693.) After an examination on March 19, 2013, Plaintiff reported her pain measured at 5 out of 10, and Dr. Spagnoletti continued Plaintiff's medications – Norflex, Kadian, Valium, and Roxicodone. (Id. at 545.) Plaintiff's pain remained at 5 to 6 out of 10 throughout 2013 visits with Dr. Spagnoletti (Id. at 527-46.)  Plaintiff last saw Dr. Spagnoletti on May 13, 2014, when she reported pain that traveled from her left leg that was sharp, stabbing, and burning.  But her pain remained between 5 and 6 out of 10. (Id. at 690.)

On October 24, 2013, Dr. Justin Schweitzer assessed Plaintiff with low back pain. (Id. at 503.)  Dr. Schweitzer opined that the Plaintiff's overall symptoms would preclude her from working 3-4 days per month, and that she would be "off-task" in excess of 35% of an eight-hour workday. (R. at 584-86, 589.)  Additionally, Dr. Schweitzer opined that Plaintiff could sit for less than four hours out of an eight-hour workday, stand for less than two hours out of an eight-hour workday, and occasionally lift and carry ten pounds. (Id. at 587.)

### 2. Cervical Impairments

On February 5, 2012, Dr. Kalliny examined Plaintiff, and diagnosed her with cervical degenerative disc disease and cervical facet arthrosis at C4-6, but on a follow-up visit on March 6, 2012, Dr. Kalliny noted that an MRI of Plaintiff's cervical spine revealed no significant abnormality. (Id. at 402.)  On August 10, 2012, Dr. Spagnoletti diagnosed Plaintiff with myofascial pain syndrome, cervical degenerative disc disease, cervical facet arthropathy and cervical radiculopathy, after Plaintiff stated that she experienced neck pain that radiated to both upper extremities. (Id. at 427-32.)  He prescribed Valium, Roxicodone and Tramadol. (Id.) On April 14, 2014, Plaintiff complained of neck stiffness, and Dr. Spagnoletti observed tenderness in the levator scapulae, scalenes, and sternalis. (Id. at 692-93.)

### 3. Migraine Headaches

On August 6, 2012, Plaintiff was evaluated by Dr. Albert J. Tahmoush for her daily headaches, was diagnosed with occipital neuralgia, and prescribed Topamax and Imitrex. (Id. at 424.) Plaintiff informed Dr. Spagnoletti on August 10, 2012 that she experienced migraine headaches. (Id. at 427-32.)  Jonathan Orwitz, M.D. examined Plaintiff on July 30, 2013, and Plaintiff stated there that she experienced daily headaches and severe headaches 12 to 15 times per month. (Id. at 610-613.)  However,

he declined to treat Plaintiff and informed her that she should be seeing a high-level pain management specialist or headache clinic to treat her headaches due to the combination of her narcotic angalgesics and headache medication. (Id.)

Then, on September 27, 2013, Plaintiff saw Dr. Sean Hubbard, and he added Nortriptyline to her treatment regimen in addition to Imitrex, Topamax, and Fioricet. (Id. at 622.) A few months later, Dr. Hubbard noted that Nortriptyline helped, but Plaintiff's migraines were still severe. (Id. at 616.)  On December 26, 2013, Dr. Hubbard completed a Headache Medical Source Statement (MSS), where indicated that Plaintiff's diagnosis was "frequent [and] intractable migraines" with associated symptoms of vertigo, nausea/vomiting, photosensitivity, visual disturbances, mood changes, mental confusion, inability to concentrate and fatigue. (Id. at 548.) Dr. Hubbard further indicated that Plaintiff would experience headaches five out of seven days a week, and may be continuous. (Id.) He opined that Plaintiff's migraine pain was profound and intractable, and virtually incapacitated her (Id. at 550.)  He opined that Plaintiff would have to lay down 1.5-2 hours on a daily unpredictable basis. (Id.)

Dr. Jay Klazer, D.O examined Plaintiff on April 23, 2014, and he concluded that her migraines were likely related to central nervous system polypharmacy. (Id. at 683-85.)  Dr.

Spagnoletti examined Plaintiff on May 13, 2014, and prescribed her Fioricet, as well as provided her a list of foods to avoid. (Id. at 690-93.)

### 4. Endometriosis

Plaintiff initially complained of right upper quadrant abdominal pain on January 6, 2012, and an ultrasound revealed a retroflexed uterus, a focal echogencity along the posterior aspect of the endometrium, which could represent adenomyosis, and two large simple cysts on the right ovary. (Id. 433-442.) She was diagnosed with an ovarian cyst. (Id.) On March 7, 2012, Plaintiff followed up with Dr. Donald Cannon, M.D., and he informed her that her cysts would likely resolve, and prescribed her Percocet and Motrin and ordered an imaging study. (Id. at 377-394.) On May 14, 2013, Plaintiff indicated to Dr. Spagnoletti that she was using a synthetic hormone to treat her endometriosis and polycystic ovary disease. (Id. at 541-42.) An MRI of Plaintiff's pelvis performed on March 4, 2014 revealed two simple cysts on the right ovary, and an enlarged right ovary. (Id. at 666-668.)

### 5. Left Ankle Tendinosis

After twisting her left ankle tripping on an uneven sidewalk on September 3, 2013, Plaintiff saw Carl Mogil, D.O., on October 14, 2013 (Id. at 573.) Plaintiff was diagnosed with a Grade I-11 left ankle sprain and/or peroneal nerve injury to

the left ankle (Id. at 574, 579.)  After she complained of
numbness in her left lateral foot, Dr. Spagnoletti recommended
that she use a cane. On November 4, 2013, Dr. Mogil ordered an
EMG and nerve conduction study. (Id. at 578-79.)  On January 6,
2014, MRI of Plaintiff's left ankle revealed mild posttraumatic
tendinosis of the peroneal tendons, subtalar arthritis and joint
effusion. (Id. at 659.)

### 6. Psoriasis

On April 27, 2011, Steven Manders, M.D. indicated that
Plaintiff had a history of an 8-month psoriasis eruption on her
feet and hands, and exhibited erythema and postulation,
bilaterally on the palm/plantar surfaces. (Id. at 361.)
Plaintiff underwent light treatment for her psoriasis on June
22, 2011, but she did not attend the treatments with enough
frequency in order to be successful (Id. at 356)  Plaintiff
informed Dr. Spagnoletti on August 10, 2012 that she had
psoriasis on her hands and feet, which caused her to leave work
in June 2011. (Id. at 427-432.)  Plaintiff informed Dr.
Spagnoletti on August 6, 2013 that she was taking Enbrel,
prescribed by Dr. David Finkelstein, for psoriatic arthritis.
(Id. at 527-546.)

### 7. Bilateral Knee Pain

On July 29, 2013, Plaintiff told Dr. Joseph Gallagher that
she had bilateral knee pain, but exhibited a full range of

10

motion without pain. (Id. at 497-98.) Dr. Spagnoletti observed crepitus in her knee on July 9, 2013, and ordered physical therapy on August 6, 2013. (Id. at 537-38.)

### 8. Urinary Retention

On May 8, 2014, an imaging study of Plaintiff's kidneys revealed an extrarenal pelvis and hydronephrosis of the right kidney, which persisted despite post voiding. (Id. at 676-77.)

### 9. Post Concussive Syndrome

Plaintiff testified that during a motor vehicle accident in 2003, she was at a stop light and was hit from the rear. (Id. at 23.)  Her head went forward and a hair clip went into her head. (Id.)  She experienced a headache thereafter.

### 10.  Mental Impairments

On June 24, 2011, Darany Toy, M.D. noted that Plaintiff had been referred to psychiatry for depression on June 6, 2011, but he was unaware of whether she followed up or not. (Id. at 23.) Plaintiff started taking Prozac and Zoloft soon thereafter. (Id.) On April 16, 2014, Dr. Schweitzer assessed Plaintiff with depression and anxiety, after Plaintiff complained of anxiety and depression. (Id. at 682.)  On May 13, 2014, Plaintiff complained of uncontrollable anxiety to Dr. Spagnoletti, and he increased her Buspar and Doxepin dosages. (Id. at 690-91.)  On May 21, 2014, Dr. Schweitzer refilled Plaintiff's Prozac, and diagnosed Plaintiff with depression with anxiety. (Id.at 686-87)

### 11.   State Agency Opinions

On January 14, 2013, Harpeet Khurana, M.D. concluded that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand or walk for 4 hours in an 7 hour day, sit for 6 hours in an 8 hour day, occasionally climbing a ramp or stairs, stooping, kneeling, crouching, crawling, and balancing, never climbing a ladder, rope or scaffold, and avoiding even moderate exposure to hazards. (Id. at 92-93.)  Dr. David Tiersten affirmed this conclusion upon reconsideration on April 25, 2013. (Id. at 104-105.)

### 12.   Plaintiff's Testimony Before the ALJ

On March 6, 2014, Ms. Nyholm testified at a hearing before ALJ Marguerite Toland. (R. at 55.)  Plaintiff testified that she limits her driving due to back pain, which shoots down her legs. (Id. at 61-62.)  She testified that her migraine headaches started when she had a motor vehicle accident in 2003. (Id. at 66.) Furthermore, she testified that she gets migraines "[l]ike twice a week," but will get them more frequently if she goes out more and is exposed to environmental triggers (Id. at 70, 81.)

With regard to her back pain, Plaintiff testified that she would rate her back pain as six or seven out of ten, but if she is active or over asserts herself, it can go up to an eight "or worse." (Id. at 71-72.)  With regard to her neck pain, Plaintiff rated that as a four out of ten, and indicated, "[i]t's like

12

real tight." (Id. at 72.)  Plaintiff further testified that she has shooting pain down her arms "[a]ll the time," has problems dropping objects, and has difficulty opening soda bottles and chips due to pain in her hands. (Id. at 84.)[2]

### 13.   The ALJ Decision

ALJ Toland issued a 27-page decision on January 22, 2015, ultimately finding that Plaintiff was not disabled within the meaning of the Social Security Act, as she made the following findings:

1.  Ms. Nyholm meets the insured status requirements of the Social Security Act through December 31, 2015.

2. Ms. Nyholm has not engaged in substantial gainful activity since June 1, 2011, the alleged onset date (20 CFR 404.1571 et seq.)

3. Ms. Nyholm has the following severe impairments: history of a motor vehicle accident with lumbar and cervical radiculopathy, disc bulging at C3-4 through C6-7, cervical facet arthropathy, myofascial pain syndrome, small disc herniation at L4-5, S1 radiculopathy and chronic L5 radiculopathy, migraine headaches, left ankle

---

[2] Vocational Expert Louis Szollosy could not attend Plaintiff's live hearing, so he responded to a series of written interrogatories submitted by the ALJ and by Plaintiff. (Id. at 234; see also infra Part IV.E.)

tendinosis, endometriosis and psoriasis affecting the feet and hands (20 CFR 404.1520(c)).[3]

4. Ms. Nyholm does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Ms. Nyholm has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the individual could work and stand up to 6 hours per day, lift 10 pounds frequently and 20 pounds occasionally. However, the individual could stand or walk no more than one hour at a time and then would need to sit or shift positions for 4 to 5 minutes while remaining on task. The individual cannot climb ropes, ladders or scaffolds; cannot work around heights, cannot work with dangerous machinery, defined as machines that cur or shear. The individual would be limited to frequent handling, and she would be off task 5 percent of the workday in addition to normal breaks.

---

[3] Importantly for the purposes of this appeal, ALJ Toland found that Plaintiff's bilateral knee pain, urinary retention, post-concussive syndrome, depression and anxiety were all "non-severe" because "the record does not support a conclusion that it caused significant vocationally relevant limitations at all times relevant to this decision. (R. at 22.)

6. Ms. Nyholm is capable of performing past relevant work as a collection agent/clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 C.F.R. 404.1565.)

Specifically regarding residual functional capacity, and at issue in this appeal, the ALJ gave "little weight" to Dr. Toy's opinion that Plaintiff would not be able to perform full time work from June 1, 2011 to July 1, 2011 and that she would experience flares causing her to be absent from work twice a month. (R. at 42.)  The ALJ also gave "little weight" to Dr. Hubbard's opinion that Plaintiff's headache medication side effects could be expected to limit her ability to focus and concentrate up to 66 percent of the workday, that she would need to recline for up to two hours per day on a daily basis, and that she would be absent for more than 4 days per month.(R. at 43.)  Additionally, the ALJ gave "little weight" to Dr. Schweitzer's opinion that Plaintiff's pain prevented her from performing her normal, full time work on a frequent basis, and that her medications caused significant side effects that limited the claimant from focusing and concentrating for up to 66 percent of the workday.  Finally, the ALJ gave "little weight" to the State agency medical consultants' opinions that Plaintiff could constantly handle and avoid moderate exposure to

hazards, because they did not consider Plaintiff's subjective complaint, but the ALJ gave "great weight" to the rest of their opinion "because it is consistent with the medical record." (Id. at 42.)

## III. STANDARD OF REVIEW

The Court has jurisdiction to review the final decision pursuant to 42 U.S.C. § 405(g).  When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  The requirement of substantial evidence, however, constitutes a deferential standard of review, see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988).  Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance. See Jones, 364 F.3d at 503.  Consequently, substantial evidence supports the Commissioner's determination where a "reasonable mind might accept the relevant evidence as adequate" to support the conclusion reached by the Commissioner. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

16

In order to facilitate this Court's review, the ALJ must set out a specific factual basis for each finding. See Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975).  Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  However, the ALJ need not discuss "every tidbit of evidence included in the record." Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004).  Rather, the ALJ must set forth sufficient findings to satisfy the reviewing court that the ALJ arrived at a decision through application of the proper legal standards, and upon a complete review of the relevant factual record. See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

## IV.  DISCUSSION

### A. LEGAL STANDARD FOR DETERMINING DISABILITY

To be eligible for social security disability insurance benefits, a claimant must have a "medically determinable physical or mental impairment" that prevents her from engaging in any "substantial gainful activity" for a continuous twelve-month period. 42 U.S.C. § 1382c(a)(3)(A); Plummer v. Apfel, 186

F.3d 422, 427 (3d Cir. 1999).  A claimant lacks the ability to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B); Plummer, 186 F.3d at 427-28.

The Commissioner reviews disability claims in accordance with a five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner must determine whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 1520(b).  If the answer is yes, the disability claim will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a "severe impairment," defined as an impairment "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c).  A claimant who cannot claim a "severe" impairment is ineligible for benefits. Plummer, 186 F.3d at 428.

Step three requires the Commissioner to compare the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d).  If a claimant suffers from a listed

impairment or its equivalent, she is approved for disability benefits and the analysis stops.  If she does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five to determine whether the she retains the ability to engage in substantial gainful activity. <u>Plummer</u>, 186 F.3d at 428.

The Commissioner conducts a residual functional capacity ("RFC") assessment at steps four and five.  The RFC assessment considers all of the claimant's medically determinable impairments and determines the most the claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1)-(2).  The RFC is expressed in terms of physical exertional levels of sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 416.967 (2002).  Based on the claimant's RFC, the Commissioner determines, at step four, whether the claimant can perform the physical exertion requirements of his past relevant work. 20 C.F.R. § 404.1520(f).  If she is unable to resume her former occupation, the Commissioner will then proceed to the final step and decide whether the claimant is capable of performing other work existing in significant numbers in the national economy, taking into account her RFC and vocational factors such as age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

In the final step, Step Five, the ALJ relies on the Medical-Vocational Guidelines ("Guidelines" or "Grids") set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, which establish the types and number of jobs that exist in the national economy for claimants with certain exertional impairments.  The Guidelines "consist of a matrix of four factors – physical ability, age, education, and work experience – and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir. 2000).

When a claimant's combination of factors correspond with the same combination of factors in the Grid, the Grid will direct a conclusion as to disability, which the ALJ must follow. Id.; see also Hall v. Comm'r of Soc. Sec., 218 F. App'x 212, 216 (3d Cir. 2007) ("When the four factors in a claimant's case correspond exactly with the four factors set forth in the grids, the ALJ must reach the result the grids reach.") (emphasis in original). However, where a claimant's specific profile is not listed in the Grid, such as when the claimant has certain limitations to their exertional capacity and can perform something in between two exertional ranges of work, the Grid does not mandate a specific finding, and may only be used as a framework to guide the disability decision. See 20 C.F.R. Pt.

404, Subpt. P, App. 2, § 200.00(d).  In such cases, the ALJ must support his determination by relying on vocational testimony or similar evidence to decide whether a significant number of jobs exist for a particular claimant given his specific background and exertional limitations. See Sykes, 228 F.3d at 264; Hall, 218 F. App'x at 217. If, after considering all the evidence, the answer is no, a finding of "disabled" is required.  However, if the Commissioner determines that jobs exist in significant numbers in the national economy for a particular claimant, the Commissioner will find the claimant "not disabled." See Sykes, 228 F.3d at 273.

### B. ALJ CONSIDERATION OF PLAINTIFF'S NON-SEVERE IMPAIRMENTS IN THE FORMULATION OF RFC

Plaintiff argues that the ALJ erred in not including Plaintiff's non-severe impairments[4] in the formulation of RFC

---

[4] Plaintiff initially contested the ALJ's characterization of Plaintiff's urinary retention, complex renal cysts, bilateral knee pain, and mental impairments as non-severe, but she conceded in her reply brief that it is "harmless that the ALJ failed to find [these] impairments to be severe." (Reply Br. at 1.)  Moreover, because the ALJ found at least one impairment to be severe and therefore continued the sequential analysis, even if the ALJ had "erroneously concluded that some of her other impairments were non-severe, any error was harmless"). Salles v. Comm'r of Sec. Sec., 229 F. App'x 140, 145 n. 72 (3d Cir. 2007); see also Barlow v. Comm'r of Soc. Sec., No. 13-538, 2014 WL 1225560, at *7 (D.N.J. Mar. 24, 2014)("[A]ny error at step two was harmless because the ALJ continued the sequential analysis.").  As a result, the Court will focus on the fact that the ALJ did not incorporate these non-severe conditions into the RFC analysis.

because it "is simply impermissible for the ALJ . . . to refuse to include [these] limitations in the formulation of RFC." Plaintiff argues that even if the ALJ's assessment of severity was incorrect, the ALJ nevertheless erred in failing to incorporate Plaintiff's bilateral knee pain, urinary retention, post concussive syndrome, depression and anxiety into the RFC analysis that followed. Defendant responds that "step two is merely a threshold analysis requiring the claimant to prove only one severe impairment," so as long as "there is at least one severe impairment at step two, the ALJ will continue the sequential evaluation process." (Def. Br. at 4)(citing 20 C.F.R. §§ 404.1520(d)-(f)).

A finding of non-severity does not eliminate Plaintiff's impairments from consideration of Plaintiff's overall ability to perform past work. The ALJ is required to assess <u>all</u> of Plaintiff's impairments—even ones that are not "severe"—in combination when making the RFC determination. See 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). SSR 96-8p is clear about what the ALJ must consider:

> In assessing RFC, the adjudicator <u>must</u> consider limitations
> and restrictions imposed by <u>all</u> of an individual's
> impairments, even those that are not "severe." While a "not
> severe" impairment(s) standing alone may not significantly
> limit an individual's ability to do basic work activities,
> it may – when considered with limitations or restrictions
> due to other impairments – be critical to the outcome of a
> claim. For example, in combination with limitations imposed
> by an individual's other impairments, the limitations due
> to such a "not severe" impairment may prevent an individual
> from performing past relevant work or may narrow the range
> of other work that the individual may still be able to do.

SSR 96-8p (emphasis added); <u>see also</u> <u>Soboleski v. Comm'r of Soc.</u>
<u>Sec.</u>, No. 14-3156, 2015 WL 6175904, at *2 (D.N.J. Oct. 20, 2015)
(explaining that a finding of non-severity "does not obviate the
need for a separate analysis of how Plaintiff's impairment
affects her RFC").  The ALJ must therefore consider all relevant
evidence when determining an individual's RFC. <u>See, e.g.</u>,
<u>Fargnoli v. Massanari</u>, 247 F.3d 34, 41 (3d Cir. 2001).

The Court finds that a remand is required on this issue
because the ALJ failed to address Plaintiff's non-severe
impairments (urinary retention, ovarian cysts, bilateral knee
pain, mental impairments) in the RFC analysis.  The effect of
these impairments, even though they were determined to be "not
severe" by the ALJ, merits discussion in the RFC analysis in
accordance with SSR 96-8p, <u>supra.</u>  Accordingly, the RFC finding
is incomplete and not supported by substantial evidence.

**C. WEIGHT OF TREATING SOURCE PHYSICIAN OPINIONS**

Even though the Court is remanding for the above reasons, the Court will address Plaintiff's other arguments. Plaintiff argues that the ALJ erred in rejecting the opinions of Dr. Darany Toy, the Plaintiff's primary care physician; Dr. Sean Hubbard, the Plaintiff's treating neurologist; and Dr. Justin Schweitzer, another of Plaintiff's primary treating physicians. (Pl. Br. at 14-15.)  Specifically, Plaintiff argues that the ALJ failed to address significant evidence in the record contradicting her conclusions, and failed to evaluate the opinions contradicting her conclusions. Defendant replies that the "ALJ did everything that was required under the regulations: she carefully considered the medical opinions, explained the weight she gave to them, and articulated legally sufficient reasons to support her conclusions." (Def. Br. at 11.)

SSR 96-8p dictates that the RFC assessment is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p.  In order to meet the requirements of SSR 96-8p, the ALJ "must specify the evidence that he relied upon to support his conclusion." Sullivan v. Comm'r of Soc. Sec., No. 12-7668, 2013 WL 5973799, at *8 (D.N.J. Nov. 8, 2013).  Moreover, the ALJ's finding of residual functional capacity must be "accompanied by a clear and satisfactory explanation of the basis on which it

24

rests." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2011) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 2011)).

It is well established that "the ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)).[5]  Furthermore, while an ALJ must consider the opinions of treating physicians, "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity" where it is not well supported or there is contradictory evidence. Chandler, 667 F.3d at 361 (alteration in original) (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)); see also Coleman v. Comm'r. of Soc. Sec. Admin., 494 F. App'x 252, 254 (3d Cir. 2012) ("Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.") (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)).  On the other hand, treating physicians' reports "should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a

---

[5] "A claimant's RFC is 'the most [she] can still do despite [her] limitations.'" 20 C.F.R. § 416.945(a)(1)).

prolonged period of time.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)

When a conflict in the evidence exists, the ALJ retains significant discretion in deciding whom to credit. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  The ALJ is entitled to weigh all evidence in making its finding, and is not required to accept the opinion of any medical expert. Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011).  In discounting evidence, however, the ALJ must give a clear explanation for why it is doing so. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 704-05 (3d Cir. 1981).

Additionally, pursuant to SSR 96-2p, if the ALJ finds that the treating source's opinion is not well-supported, that "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 CFR 404.1527 and 416.927." These factors include the examining relationship, the treatment relationship (the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship), supportability, consistency, and specialization. See 20 C.F.R. § 404.1527(c)(1)-(5).

### 1. Dr. Schweitzer

Regarding Dr. Schweitzer, Plaintiff takes issue with the
ALJ's characterization that his opinion was "inconsistent with
the record" and that his "lack of expertise in vocational
training and occupational health coupled with his specialty in
internal medicine has not provided a balanced review of the
claimant's limitations." (R. at 43.)  Plaintiff argues that not
only is Dr. Schweitzer's opinion consistent with the records of
Dr. Louis Spagnoletti, Dr. Joseph Gallagher, and Dr. Carl Mogil,
but that the ALJ did not address the conflict of this consistent
evidence in her decision. (Pl. Br. at 17.)  Plaintiff also
argues that no doctors have specific "expertise in vocational
training," and that under this standard, "it would be nearly
impossible for any treating doctor to be entitled to weight."
(Pl. Br. at 17.)

The Court finds that the ALJ's decision to assign little
weight to Dr. Schweitzer's opinions is supported by substantive
evidence.  The Third Circuit has consistently stated that form
reports in which a physician's obligation is only to check a box
or fill in a blank are weak evidence at best.  Where these so-
called "reports are unaccompanied by thorough written reports,
their reliability is suspect...." Mason v. Shalala, 994 F.2d
1058, 1065 (3d Cir. 1993); see also Hevner v. Comm'r of Soc.
Sec., No. 16-1851, 2017 WL 128499, at *2 (3d Cir. Jan. 13,

2017)(affirming the ALJ's decision to discount the opinion of the claimant's treating physician who checked boxes on a form titled "Mental Capacity Assessment").  Here, Dr. Schweitzer filled out a Medical Source Statement, which required him to opine, without a full written report, about Plaintiff's various impairments. (R. 583-90.)

Moreover, the ALJ provided sufficient reasoning for her discounting of Dr. Schweitzer's opinion. She explained that "[t]he record suggests that Dr. Schweitzer, who does not have a specialization in dermatology, gynecology, orthopedics, or neurology, relied heavily on the claimant's subjective complaints regarding her physical impairments to guide the completion of his opinion." (R. at 43.)  As a result, the ALJ was entitled to discount Dr. Schweitzer's opinion, and Plaintiff's disagreement with the ALJ's opinion is not enough to remand given the deferential "substantive evidence" standard.

### 2. Dr. Hubbard

Next, regarding Dr. Hubbard, Plaintiff argues that the ALJ improperly substituted her own medical opinion for that of a doctor when she assigned "little weight" to his opinion because Dr. Hubbard "did not suggest that the claimant seek treatment at a specialized headache center secondary to the combination of medications she was taking as another of his colleagues had recommended." (Pl. Br. at 19.)  Plaintiff argues that the ALJ

does not explain how Dr. Hubbard's belief that he was qualified to treat the Plaintiff somehow disqualifies him for offering an opinion as to her neurological condition, and moreover, his opinions are not contradicted by any evidence in the record, nor does the ALJ attempt to offer specific contradictory evidence. (Id.) Moreover, he "spent sufficient time with Plaintiff to develop a treatment plan and undertake specialized care for her migraines," so length of treatment and number of visits is not dispositive. (Reply Br. at 4.)

The Court finds that the ALJ's decision to discount the opinion of Dr. Hubbard was based on substantial evidence. In a "Headache Medical Source Statement," Dr. Hubbard responded "Yes" when asked "During times your patient has a headache, would you patient generally be precluded from performing even basic work activities and need a break from the workplace?" (R. at 551.) The ALJ permissibly discounted Dr. Hubbard's opinion because he only treated her twice prior to rendering his opinion. See 20 C.F.R. § 404.1527(c)(2)(i)("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The ALJ appropriately gave weight the opinion of another treating physician, Dr. Jay Klazmer, who opined that her "multiple other complaints are likely related to her CNS polypharmacy" as well as "unequivocal medication and

caffeine overuse components . . . especially given a normal neurological examination and brain MRI in 2009." (R. at 684.) As a result, the ALJ did not err in assigning little weight to Dr. Hubbard's opinion regarding Plaintiff's migraine headaches, given that his opinion conflicted with other record evidence from a treating physician who had a broader view of the pertinent record.

### 3. Dr. Toy

Finally, regarding Dr. Toy, Plaintiff argues that the ALJ erred when she assigned "little weight" to her opinion that Plaintiff was incapacitated between June 1, 2011 and July 1, 2011 because like with Dr. Schweitzer, her opinions were not "inconsistent with the record" and her "lack of expertise in vocational training" is not relevant to evaluating the weight of a treating physician's opinion. (Pl. Br. at 20.)  The Court disagrees.  On a fill-in-the-blank FMLA leave form, Dr. Toy checked "Yes" when asked "Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?" (R. at 515.)  However, on the form, Dr. Toy wrote that "[t]reatment options are available for her condition." (Id.) The ALJ properly explained that "the totality of the medical evidence shows that the claimant is not as limited as determined by Dr. Toy," and his own form suggests that Plaintiff could be treated. Moreover,

the ALJ properly discounted Dr. Toy's opinion given her lack of specialization. See 20 C.F.R. § 404.1527(c)(5)("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

The ALJ also correctly noted that the determination of whether a claimant meets the statutory definition of "disabled" is an issue reserved for the ALJ, not a physician, pursuant to SSR 96-5(p).  The ALJ therefore acted correctly in not giving significant weight to Dr. Toy's opinion that Plaintiff was "incapacitated;" see 20 CFR §§ 404.1527(d)(1)(" A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."); Schwartz v. Halter, 134 F. Supp. 2d 640, 650 (D.N.J. 2001) ("Opinions on issues reserved to the Commissioner, such as an opinion that the claimant is disabled, are not medical opinions, however, and thus are not entitled to controlling weight.").

Finally, Plaintiff argues that the ALJ erred in finding that the three treating physician opinions discussed above were "inconsistent with the record." However, the ALJ describes the conflicting evidence in detail throughout the entirety of her reasoning on residual functional capacity. For instance, the ALJ was entitled to rely on the state agency physician opinions in her discretion, especially since those physicians provided ample

31

reasoning in their decisions. <u>See</u> <u>Grimaldi v. Colvin</u>, No. 12-6522, 2016 WL 1182704, at *4 (D.N.J. Mar. 28, 2016)(citations omitted)(stating that "the opinions of non-examining physicians may override a treating source's opinions provided that the former are supported by evidence in the record").

## C. CREDIBILITY DETERMINATION

Plaintiff argues that the ALJ erred in her determination of credibility, specifically taking issue with the ALJ's statement that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 29; Pl. Br. at 26.)[6]  Defendant responds that under 20 C.F.R. § 404.1529, the ALJ properly weighed Plaintiff's testimony against the rest of the relevant evidence. (Def. Br. at 7.)

"The credibility determinations of an administrative judge are virtually unreviewable on appeal." <u>Hoyman v. Colvin</u>, 606 F. App'x 678, 681 (3d Cir. 2015) (quoting <u>Bieber v. Dep't of the Army</u>, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).  Therefore, an ALJ's credibility determination is accorded great deference and

---

[6] The ALJ also found that Plaintiff "experiences some pain and discomfort from her severe impairments; however, not the extent maintained by the claimant." (R. at 41.)

will not be disturbed unless it is "inherently incredible or patently unreasonable." See St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005); see also Blue Ridge Erectors v. Occupational Safety & Heath Review Comm'n, 261 F. App'x 408, 410 (3d Cir. 2008). Pursuant to SSR 96-7p, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p also "mandates that the [credibility] 'determination ... must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to ... any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Williams v. Barnhart, 211 F. App'x 101, 105 (3d Cir. 2006) (quoting SSR 96-7p).[7]  However, inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully

---

[7] SSR 96-7p also provides that the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." The ALJ should also give weight to factors such as the medical reports, a plaintiff's daily activities, duration and intensity of symptoms, and treatments that have been used to relieve symptoms. 20 C.F.R § 404.1529(c).

credible. See Burns v. Barnhart, 312 F.3d 113, 129–30 (3d Cir. 2002).

Furthermore, an individual's subjective reports of the nature and extent of their symptoms cannot be rejected "solely because the available objective medical evidence does not substantiate [the individual's] statements." 20 C.F.R. 404.1529(c)(2).  This recognizes the fact that "symptoms, such as pain, sometimes suggest a greater severity of impairment that can be shown by objective medical evidence alone." SSR 96-7p. In considering a plaintiff's subjective reports of symptoms, such as pain, as the Court has already noted, the ALJ should not rely upon her own lay opinion or speculation in making a credibility determination. See Morales, 225 F.3d at 319.

The Court finds that the ALJ's credibility determinations were based on substantial evidence. The ALJ conceded that a number of Plaintiff's impairments "could reasonably cause some symptomatology," but after carefully walking through each ailment and the objective medical evidence, she found that the symptoms did not "occur with such frequency, duration or severity" to "preclude all work activity on a continuing and regular basis." (R. at 39.)  For instance, the ALJ acknowledged that Plaintiff experienced "occasional pain" from her endometriosis, as she stated at the hearing, but then concluded that "her pain is generally well controlled with her

34

medication." (Id. at 40.)  With other ailments, such as
Plaintiff's left ankle pain, the ALJ took into account her
subjective complaints in assigning an RFC of light level of
exertion with a sit/stand option. (Id. at 41.)

Regarding headaches, Plaintiff argues that the ALJ
mischaracterized the notes of Drs. Orwitz and Klazmer, and
instead inserted her own lay opinion as to the proper course of
treatment that Plaintiff should have followed for that of her
treating doctors. (Pl. Br. at 26-27.)  But the ALJ explained
that Plaintiff's "reported elevated pain levels, which mirrors
complaints of those individuals having significantly more
pathology in their imaging studies, objective evaluations, and
lab test results, casts doubt on [Plaintiff's] testimony
[regarding her pain]." (R. at 41.)  The ALJ cited to the
"conservative treatment" for her headaches, including Topamax,
Imitrex, Fioricet and Pamelor, and that Dr. Klazmer suggested
that Plaintiff's headaches were appropriate for treatment at a
specialized headache center. (R. at 41, 612.) The Court finds
that that ALJ permissibly found that Plaintiff's subjective
complaints regarding her headaches did not match up with the
objective medical evidence given her medication; thus, the
credibility determination was based on substantial evidence.

Plaintiff also takes issue with the ALJ's discounting
Plaintiff's credibility based on one instance of pulling weeds

in her garden. The ALJ found that Plaintiff's "activity level in engaging in outdoor yard work suggests that her physical limitations were not as significant as she alleged in her Adult Function Report," where Plaintiff indicated that she had difficulty performing most activities of daily living due to pain. (R. at 41, 497.)  The Court agrees with Defendant, that the ALJ "did not base her entire credibility assessment on the fact that Plaintiff was pulling weeds in her yard, because she appropriately cited it as one factor, in addition to the objective evidence." (Def. Br. at 10.)  Of course, if the ALJ only cited to one buried instance of physical activity in discounting Plaintiff's credibility, that might not be based on substantial evidence, but this is not what the record demonstrates here.[8]

Moreover, by no means did the ALJ simply dismiss Plaintiff's complaints; the strict limitations of her RFC are

---

[8] Plaintiff additionally takes issue with the ALJ's statement, regarding Plaintiff's lower back pain, that Plaintiff "admitted in testimony that her pain levels reduced with her medications down to 3 or 4 out of 10 when she was not engaging in strenuous activities." (R. at 40, 72.) She argues that the ALJ failed to indicate how reduced pain due to inactivity and the use of narcotic pain medication negatively affects Plaintiff's credibility. (Pl. Br. at 26.)  However, it does not appear that the ALJ was discounting Plaintiff's credibility regarding her subjective back pain complaints here; instead, the ALJ considered these "mild to moderate pain levels" when determining her RDC. (R. at 40.)  This finding was based on substantial evidence.

testimony to that.  But the ALJ did find Plaintiff less than credible as to the disabling severity of her impairments.  The ALJ's decision, supported by substantial evidence of record, represents a classic credibility determination and a weighing of the evidence, to which the court must defer. See Jimenez v. Colvin, No. 15-3762, 2016 WL 2742864, at *8 (D.N.J. May 11, 2016)("Whether the court would weigh the evidence the same way is irrelevant."). The disparity between Plaintiff's description of her symptoms and the impairment documented in the objective medical records cited by the ALJ therefore constitutes substantial evidence in support of the ALJ's determination of credibility.

### D. EVALUATION OF INTERROGATORIES PROPOUNDED BY PLAINTIFF ON THE VOCATIONAL EXPERT, LOUIS P. SZOLLOSY

Finally, Plaintiff contests the ALJ's finding that Plaintiff could perform her past relevant work because the Vocational Expert allegedly offered conflicting opinions in his written testimony that the ALJ failed to reconcile.  Plaintiff argues that the VE offered conflicting opinions, both that an individual could be off-task (i.e., not performing work duties) for 5% of the workday in addition to routine work breaks, and also that an individual only providing 6.5 hours of work in an 8-hour day would be unable to sustain employment. (Pl. Br. at 22.)  The ALJ concluded that "the workday involves an 8-hour

period, not a period reduced as reflected in the Plaintiff's representative argument," but Plaintiff argues that the ALJ "misinterpreted both the Plaintiff's question to the VE, as well as its relevance to her adopted RFC." (R. at 45, Pl. Br at 22.) The Commissioner responds that such objection to the VE interrogatory responses relates to the alternative step five finding, but the ALJ properly decided the case at step four. (Def. Br. at 16.)

In the instant matter, although no VE was present during the hearing, the ALJ posed post-hearing interrogatories to the VE regarding a hypothetical individual with Plaintiff's RFC and vocational factors, and the VE supplied answers to these written inquiries. (R. 234-35.) The ALJ asked the VE the following hypothetical:

> Please assume an individual having claimant's age education and past work. Please assume this individual is limited to light work as defined under the DOT in that he/she can walk and stand up to 6 hours per day, lift 10 pounds frequently and 20 pounds occasionally. However, this individual can stand/walk no more than one hour at a time and then would need to sit/shift positions for 4-5 minutes while remaining on task. This individual cannot climb ropes, ladders or scaffolds; cannot work around heights; cannot work with dangerous machinery (defined as machines that cut or shear). This individual would be limited to frequent handling. Lastly, he/she would be off task 5% of the workday in addition to normal breaks.

(Id. at 234)  The VE responded that she could perform her past relevant work as a collection agent/clerk, DOT §241.367-010 (Sedentary), and explained that:

> Based on the hypothetical above, and based on my
> professional opinion, an individual would be able to
> perform the past relevant work as performed and as
> performed in the national economy. Being off task would not
> be problematic based on my professional opinion, since
> employees can be categorized in such
> levels as exceptional, average, and mediocre employee
> levels, and the 5% would be within the latter category as
> is tolerated in the competitive workforce.

(Id.)  Plaintiff was provided with a copy of the VE responses

and submitted additional hypotheticals and follow-up

hypotheticals to the VE. (Id. at 240-42.) Most notably,

Plaintiff asked:

> Adding to the judge's first hypothetical, I would like you
> to consider whether each of the following limitations,
> considered individually, would have an impact on the
> ability to perform the past-relevant work or other jobs
> that you have identified . . . (d) The inability to perform
> more than 6.5 hours of work activity in an 8-hour workday,
> please also give your opinion as to the expected amount of
> time, in hours, an employee would be expected to actively
> perform work-related activities in order to sustain
> competitive employment and to be considered full-time.

(Id. at 241.) The VE responded:

> Based on my professional opinion, full time employment is
> considered 8.0 hours. Certain occupation settings have paid
> lunch periods an (sic) in those settings full time is
> considered 7.5 hours.

(Id. at 245-46)

Soon thereafter, on September 26, 2014, Plaintiff submitted

a letter to the ALJ with comments and concerns relating to the

VE's responses, specifically regarding the alleged conflict

between the ALJ hypothetical and Plaintiff's hypothetical. (Id.

at 252-253.) Plaintiff explains that she simply "reformulated

this question in terms of absolute time rather than a percentage of time off-task without defining regular breaks." (Reply Br. at 6.)

The Court finds that the ALJ's evaluation of the VE's responses to both her interrogatories and Plaintiff's interrogatories was based on substantial evidence. Not only had the VE already answered the question that Plaintiff had asked, but the VE's response to Plaintiff's "reformulated" question does not, on its face, contradict the VE's first response, as being "off task" is different than an "inability to perform," as Plaintiff asked.  Moreover, the ALJ relies on the VE's response to her (first) hypothetical, that Plaintiff could perform past relevant work as a collections agent.  The ALJ then addressed Plaintiff's specific argument in her opinion, noting that "[n]othing in the vocational expert's responses to [Plaintiff's] interrogatories reflects that all work would be ruled out in the national economy with this [5 percent off task] limitation." (R. at 45.)  The Court notes, however, that the hypotheticals posed to the VE may have to be reformulated on remand, after the ALJ reconsiders Plaintiff's Residual Functional Capacity as required above, in light of the combination of severe and non-severe physical and mental impairments.  If the RFC, on remand, is more constricted, that determination would also have to be considered

in addressing the subsequent step related to the ultimate determination of disability status.

**V. CONCLUSION**

For all of these reasons, the Court finds that substantial evidence supports the ALJ's weighing of treating physician opinions regarding residual functional capacity, the ALJ's credibility determination, and the finding that Plaintiff could perform her past relevant work as it is usually performed in the national economy, but that the case should be remanded to ensure that all of Plaintiff's non-severe impairments are incorporated into the residual functional capacity analysis and the subsequent steps of adjudication, as appropriate. An accompanying Order will be entered.


**March 31, 2017**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            Chief U.S. District Judge

41